# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM S32363**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Barbara C. THOMAS**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 27 April 2017

————————————

*Military Judge:* Andrew Kalavanos.

*Approved sentence:* Bad-conduct discharge, confinement for 14 days, and reduction to E-1. Sentence adjudged 14 October 2015 by SpCM convened at Joint Base Charleston, South Carolina.

*For Appellant:* Major Jarett Merk, USAF; Major Thomas A. Smith, USAF; Captain Annie W. Morgan, USAF.

*For Appellee:* Captain Matthew L. Tusing, USAF; Gerald R. Bruce, Esquire.

Before J. BROWN, SANTORO, and MINK, *Appellate Military Judges.*

Judge SANTORO delivered the opinion of the court, in which Senior Judge J. BROWN and Judge MINK joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

SANTORO, Judge:

A military judge sitting as a special court-martial convicted Appellant, contrary to her pleas, of wrongfully using cocaine, wrongfully using marijuana on divers occasions, and wrongfully distributing marijuana on divers occa-

sions in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a. The adjudged and approved sentence was a bad-conduct discharge, confinement for 14 days, and reduction to E-1.

Appellant raises four assignments of error: (1) the military judge erred by admitting a report of data allegedly contained on Appellant's cellular telephone, (2) the military judge erred by admitting opinion testimony from a witness who had not been qualified as an expert, (3) her conviction for wrongfully distributing marijuana is factually and legally insufficient, and (4) her conviction for wrongfully using cocaine is factually and legally insufficient. We agree that the military judge abused his discretion by admitting the cellular telephone extraction report and related testimony. Because those errors were not harmless, we set aside Appellant's convictions and authorize a rehearing.[1]

## I. BACKGROUND

After testing positive for cocaine during an inspection urinalysis, Airman First Class (A1C) CB began working as a confidential informant for the Air Force Office of Special Investigations (AFOSI). His duties included reporting on drug use by other Airmen and wearing recording devices in situations where drug use might be discussed. While working for AFOSI, A1C CB attended a party at a friend's apartment. He brought cocaine and placed it along with a card and a dollar bill on the kitchen counter. Appellant also attended. According to A1C CB, when Appellant arrived, she "made her own line" of cocaine and ingested it through her nose with the aid of the dollar bill.

Airman Basic (AB) HB testified that he was acquainted with Appellant and had used marijuana with her on multiple occasions. He also testified that Appellant provided him marijuana.

## II. DISCUSSION

The AFOSI obtained a search authorization for Appellant's cellular telephone. Pursuant to that authorization, AFOSI obtained the telephone and generated a report of the data contained therein (the "extraction report").

The only witness called by the Government to establish the admissibility of the extraction report was Special Agent (SA) LS. She testified that she was

---

[1] Our setting aside of Appellant's convictions moots her third and fourth assignments of error.

the primary investigator on Appellant's case but went on temporary duty while the investigation was ongoing. SA LS played no apparent role in seizing Appellant's phone, conducting the extraction, or comparing the extracted data with the data visible on the phone at the time of the extraction. Rather, she found the report in question in the case file upon her return. She surmised that the report related to Appellant's case because Appellant's name appeared on the report's cover sheet, it bore the file number of Appellant's investigation, and it appeared to contain data from a phone number she believed was Appellant's. SA LS believed the phone number to be Appellant's because, on another document in the case file, she found a notation that Appellant had given that phone number to a different agent during an interview related to the investigation.

The extraction report consisted of a cover page, which included the image of the AFOSI badge, the AFOSI case number, the case name ("THOMAS (S), SOCIETY (V)"), and the examiner name "SA [BS]." SA LS testified that none of this information was generated by the Cellebrite software used to create the report; rather, the agent who generated the report entered that information manually. Nowhere in the report is any obvious indication that the phone from which the data was extracted belonged to Appellant. The report also contained what the Government asserted were text messages between Appellant and others identified by individual line numbers. The 19-page portion of the report offered into evidence was obviously incomplete, as there are gaps in the line numbers between groups of messages and SA LS testified that the full report was "a few thousand pages."

SA LS testified that, based on her review of the report, it was her opinion that it "fairly and accurately represent[ed] the extracted contents" of Appellant's telephone. SA LS was neither qualified nor recognized as an expert witness. When asked by the military judge to explain how reports of this type are generated, SA LS testified:

> The process, what happens is we pull the report from the phone through the [C]ellebrite device. It goes onto a laptop which then it's pretty much just a whole bunch of metadata, so then you hit—there's a button that says generate report. You hit generate report, and then it compiles everything into a chronological timeline of everything that happened. It also separates text messages, instant messages, call logs.

The military judge asked SA LS whether text messages contained in the report would have appeared on Appellant's phone.

> MJ: I'd like to ask the witness some questions about that. That's not clear to me as to why these text messages—how does

the witness know that these text messages that don't list her number appear on the accused's telephone.

ATC: Yes, Your Honor.

MJ: I'm sorry, Special Agent [LS]. There are some text messages that are included in this that and the one column does not indicate that it's the accused's phone number. Do you have an opinion as to whether or not those text messages appeared on the accused's phone?

WIT: Sir, they all come on the phone. If you can see in the very far right corner there's some boxes that say yes. If you look through the report those are the deleted so it also pulls deleted messages, as well. If they did not say yes they were indeed on the phone, sir.

The military judge admitted the extraction report and also allowed SA LS to testify about the contents of the text messages and, based apparently only on what she saw in the report, who she believed sent them.

It is not evident from the record why the Government elected not to call SA BS, who at the time of trial was apparently still on active duty but had been reassigned to another base. Nor is it clear why the Government did not have any of the people who were alleged to have sent and received the messages testify about them. There was no evidence presented concerning which agent(s) obtained the phone that was analyzed, how or from whom it was obtained (other than pursuant to a search authorization), or that the phone SA BS seized from Appellant was the same phone that SA BS analyzed.

## A. The Extraction Report

Trial defense counsel objected to the report's admissibility based on hearsay,[2] improper foundation,[3] and confrontation.[4] The Government's theory of admissibility seemed to be that the report itself was authenticated by SA LS and admissible as a business record, the text messages Appellant sent were not hearsay, and the text messages sent to her were admissible for their "effect on the listener."

---

[2] Mil. R. Evid. 802.

[3] Mil. R. Evid. 901.

[4] U.S. CONST. Amend. VI.

The military judge declined to admit the extraction report as a record of a regularly-conducted business activity.[5] However, he admitted the report pursuant to Mil. R. Evid. 801(d)(2) (statements by party opponent are not hearsay) and 804(b)(3) (statements against interest are an exception to the rule against hearsay) without explaining his analysis or conducting a Mil. R. Evid. 403 balancing test. As the military judge did not articulate the way in which he believed the Government had established the necessary evidentiary foundation, we can only surmise that he believed the agent's experience conducting cell phone extractions in other cases enabled her to offer her lay opinion that the report at issue related to Appellant's phone, that the other agent who conducted the extraction used the Cellebrite software properly, and that the contents of the report accurately reflected what SA BS (or the Cellebrite software) found on the telephone.

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)). Non-constitutional error is harmless unless it had "a substantial influence on the findings." *United States v. Solomon*, 72 M.J. 176, 182 (C.A.A.F. 2013). However, for constitutional error to be harmless, we must be convinced "beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence." *United States v. Kreutzer*, 61 M.J. 293, 298 (C.A.A.F. 2005) (quoting *United States v. Kaiser*, 58 M.J. 146, 149 (C.A.A.F. 2003)).

While in many cases the concepts are intertwined, it is important to remember that physical or documentary evidence must both be authenticated

---

[5] The military judge stated, "I find that Agent [LS] has laid the foundation for the report. I do not find that it falls under the 803(6) record of regularly conducted activity. This is an investigative report so that does not apply." The military judge did not fully explain why he declined to admit the report as a business record but the record supports two bases for his decision. First, SA LS failed to establish the required predicate facts under either Mil. R. Evid. 902(11) and/or Mil. R. Evid. 803(6). Second, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the Supreme Court acknowledged that while documents kept in the regular course of a business may ordinarily be admitted at trial despite their hearsay status, "that is not the case if the regularly conducted business activity is the production of evidence for use at trial." *Id.* at 321. *See also Bullcoming v. New Mexico*, 564 U.S. 647 (2011).

*and* admissible.[6] A properly-authenticated exhibit may nonetheless contain inadmissible hearsay requiring its exclusion. *United States v. Browne*, 834 F.3d 403, 415 (3d Cir. 2016).

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Mil. R. Evid. 901(a). Evidence may be authenticated in many ways, including through the testimony of a witness with knowledge, Mil. R. Evid. 901(b)(1), or testimony describing a process or system and showing that it produces an accurate result. Mil. R. Evid. 901(b)(9). Whether evidence has been properly authenticated is a preliminary question not bound by the rules of evidence. Mil. R. Evid. 104(a). However, when the authentication of evidence depends upon whether a fact exists, there must be admissible proof that the trier of fact could find that the fact exists. Mil. R. Evid. 104(b). *See also Huddleston v. United States*, 485 U.S. 681, 690 (1998) (in determining whether the government has introduced sufficient evidence to meet Rule 104(b), the court decides whether *the jury* could reasonably find the conditional fact by a preponderance of the evidence) (emphasis added).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause prohibits (1) testimonial out-of-court statements; (2) made by a person who does not appear at trial; (3) received against the accused; (4) to establish the truth of the matter asserted; (5) unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him. *Crawford*, 541 U.S. 42–59. A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Mil. R. Evid. 801(a). "[N]o testimonial hearsay may be admitted against a criminal defendant unless (1) the witness is unavailable, and (2) the witness was subject to prior cross-examination." *United States v. Blazier*, 69 M.J. 218, 222 (C.A.A.F. 2010) (citing *Crawford*, 541 U.S. at 53–54). The Sixth Amendment bars only testimonial statements because "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006).

---

[6] For example, with respect to business records, their authentication is governed by Mil. R. Evid. 902(11). Their admissibility as an exception to the rule against hearsay is governed by Mil. R. Evid. 803(6).

We first consider whether the extraction report was properly authenticated. SA LS played no role in the seizure of Appellant's phone. She had nothing to do with the generation of the extraction report nor was she present when it was generated. There was no suggestion that she spoke with SA BS about the analysis or how it was conducted. She had no personal knowledge about how the extraction report compared to information that may have been visible on the phone at the time of the extraction. The only way SA LS connected the report to Appellant was via Appellant's apparent statement to another agent (who also did not testify at trial), outside of SA LS's presence, that the phone number in question was hers. Simply put, SA LS had absolutely no personal knowledge about the extraction of the data or the generation of the report in Appellant's case. And, because her entire knowledge of the report was based on its being in the case file, she would also necessarily not have been able to testify that the report had not been altered.

The extent of SA LS's personal knowledge was that the extraction report looked like other reports she had generated in the past and it was found in Appellant's case file. We question whether her testimony was sufficient to authenticate the extraction report.[7] However, we need not resolve that issue

---

[7] The Government points to no cases, in our or any other jurisdiction, in which a similar report was authenticated by a lay witness who played no role whatsoever in its creation, nor are we aware of any. Consider this scenario: Detectives A and B are investigating a ring of drug users. While Detective A is out of state on vacation, Detective B obtains a search warrant for a suspect's home. Detective B executes the search and, in the suspect's bedroom, finds a stack of letters—some apparently written by the suspect and some apparently written to the suspect—some of which appear to discuss the suspect's involvement with drugs. Detective B seizes the letters, completes an evidence tag noting where he found the letters, and places the letters in the investigative case file. At trial, the Government attempts to establish the evidentiary foundation for the letters by calling only Detective A. Detective A testifies that she did not have a role in obtaining the search warrant, was not present when it was executed, believed the search was of the suspect's house only because of something else she read in the report, believed the letters were found in the suspect's bedroom because of what she read on the evidence tag, and believed that the letters were in the same condition as when originally found because she trusted that Detective B would not have altered the evidence. In *United States v. Rowe*, ACM No. 34776, 2002 CCA LEXIS 291 (A.F. Ct. Crim. App. 26 Nov 2002) (unpub. op.), we confronted a similar, although not identical, scenario, in which the testimony of an agent present when a document was found, in conjunction with an evidence custodian who testified about information contained on an evidence tag, was sufficient to authenticate a document. We question whether *Crawford* would permit Detective A in the hypothetical scenario, or the evidence custodian in *Rowe*, to testify as they did.

because we conclude that the Government failed to establish the relevance of the extraction report to Appellant's case.

The only evidence that linked the extraction report to Appellant's phone was SA LS's testimony that Appellant gave her telephone number to another agent who then wrote that number on a form contained within the case file. The form on which this number appeared was not admitted into evidence nor did the agent to whom Appellant purportedly made this statement testify. While Appellant's statement about her telephone number would not be hearsay (Mil. R. Evid. 801(d)(2)), the unnamed agent's written assertion that Appellant made that statement was. Mil. R. Evid. 801.[8] It was made out of court. It was made as part of a criminal investigation into Appellant's conduct with an eye toward its later use at trial and was therefore testimonial. It was received against Appellant to establish the truth of the matter asserted. Appellant therefore had a constitutional right to confront the unnamed agent about that assertion. *Crawford* 541 U.S. at 46–47. As noted above, the only evidence linking the extraction report to Appellant was SA LS's repetition of the unnamed agent's inadmissible statement that Appellant possessed a cell phone with a certain phone number. Without that link, a link which was not properly before the trier of fact, the exhibit bore no relevance to Appellant and the military judge abused his discretion by admitting it.[9]

**B. Testimony about the Extraction Report**

SA LS testified about the contents of the erroneously-admitted report and the Government used her to highlight certain apparently-incriminating messages. Without having been qualified as an expert witness, or even explaining whether she had any personal experience using the brand of cell phone at is-

---

[8] Neither the rules of evidence nor the Sixth Amendment would allow an agent who was not present during an interview to repeat an accused's statement simply because the agent found a summary of it in the case file. *See United States v. Taylor*, 53 M.J. 195, 200–01 (C.A.A.F. 2000) (suggesting Confrontation Clause violation if a witness who was not present during an interrogation testified about the substance of the interrogation based only on the interviewer's notes).

[9] The Government's citation to cases involving forensic laboratory reports (particularly following urinalysis inspections) does not address the fundamental problem in this case: no witness with personal knowledge testified that the data contained in the report was extracted from Appellant's phone. In the urinalysis context, that would be akin to attempting to prove that the urine tested came from the accused based solely on the data contained in the laboratory report (offered by a lay witness) without calling a witness who could establish that the accused provided the sample that was tested.

sue, SA LS opined that the messages in the extraction report would have appeared on Appellant's phone. She also opined that one of the people with whom Appellant exchanged text messages was KM; she based that opinion on her belief that a certain e-mail address belonged to KM but never explained the source of that belief.

Although SA LS testified generally about the investigation and A1C CB's performance as an informant, by far the most inculpatory portion of her testimony was based on her review of the extraction report. Because that report was erroneously admitted, she appeared to have no independent basis for her testimony, and she had not been qualified as an expert (and thus able to offer other than a lay opinion), the military judge abused his discretion by allowing SA LS to testify about the contents of the extraction report.

## C. Prejudice

Having found that the military judge erred in his admission both of the extraction report and SA LS's testimony about information contained therein, we next consider whether these errors were harmless. In addition to SA LS, the Government called three witnesses. One witness, A1C CB, testified that he saw Appellant use cocaine at a party and heard her make statements about using marijuana. A second witness, AB AM, confirmed the presence of cocaine at the party but did not see Appellant ingest any. The third witness, AB HB, was also present at the party and saw Appellant lean toward the cocaine but did not see her ingest it. AB HB also testified that he smoked marijuana with Appellant on multiple occasions including smoking marijuana that Appellant provided. He testified that the term "firewood" (a word which also appeared in texts in the extraction report) was a code word for marijuana.

As noted above, A1C CB and AB HB were the only two witnesses who offered direct evidence of Appellant's drug use. To put it mildly, their testimony was riddled with internal inconsistencies and discrepancies. Establishing proof beyond a reasonable doubt based solely on these witnesses' accounts would have been a daunting challenge. But the Government had more: it had the extraction report. In message after message, Appellant engaged in conversations about marijuana and its use. The contents of the report were not only significant admissions but also bolstered the credibility of the otherwise-shaky A1C CB and AB HB. The contents of the extraction report also played a prominent role in the Government's closing argument.

We cannot say that the erroneous admission of the extraction report and SA LS's testimony related thereto did not substantially influence the findings with respect to the use and distribution of marijuana specifications. And although the extraction report contained no statements relating to the use of

cocaine, because the report served to corroborate the testimony of otherwise potentially unreliable witnesses, we cannot say that its admission did not influence the findings with respect to the cocaine specification as well.

### III. CONCLUSION

The findings and sentence are **SET ASIDE**. The record of trial is returned to The Judge Advocate General. A rehearing is authorized.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court