Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/04/2025 09:10 AM CST

State of Nebraska, appellee, v.
Shaquille M. Falcon, appellant.

___ N.W.3d ___

Filed January 28, 2025.    No. A-23-953.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

4. **Jury Instructions.** Whether jury instructions given by a trial court are correct is a question of law.

5. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusions.

6. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

7. **Constitutional Law: Search and Seizure: Warrantless Searches.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions.

8. **Warrantless Searches.** The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.

9. **Warrantless Searches: Proof.** It is the State's burden to show that a search falls within an exception to the warrant requirement.

10. **Warrantless Searches: Motor Vehicles.** Nebraska has recognized that among the established exceptions to the warrant requirement is the automobile exception.

11. **Constitutional Law: Search and Seizure: Duress.** Generally, to be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne.

12. **Warrantless Searches: Duress.** Consent must be given voluntarily and not as a result of duress or coercion, whether express, implied, physical, or psychological.

13. **Constitutional Law: Search and Seizure.** The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law.

14. **Search and Seizure.** Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent.

15. **Warrantless Searches: Proof.** When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

16. **Warrantless Searches: Police Officers and Sheriffs.** A warrantless search is valid when based upon consent of a third party whom the police, at the time of the search, reasonably believed possessed authority to consent to a search of the property, even if it is later demonstrated that the individual did not possess such authority.

17. **Search and Seizure: Police Officers and Sheriffs.** The search of property based on consent by a third party must be judged against an objective standard: Would the facts available to the officer at the moment

warrant a person of reasonable caution in the belief that the consenting party had authority over the property?

18. **Search and Seizure: Warrantless Searches: Probable Cause: Motor Vehicles.** The automobile exception to the warrant requirement applies when a vehicle is readily mobile and there is probable cause to believe that contraband or evidence of a crime will be found in the vehicle.

19. **Motor Vehicles: Words and Phrases.** A vehicle is readily mobile whenever it is not located on private property and is capable or apparently capable of being driven on the roads or highways.

20. **Search and Seizure: Probable Cause: Words and Phrases.** Probable cause to search requires that the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of a crime will be found.

21. **Probable Cause: Police Officers and Sheriffs: Motor Vehicles.** Probable cause may result from any of the senses, and an officer is entitled to rely on his or her sense of smell in determining whether contraband is present in a vehicle.

22. **Warrantless Searches: Probable Cause: Motor Vehicles: Controlled Substances: Police Officers and Sheriffs.** Because of marijuana's legal status as contraband, a trained officer who detects the odor of marijuana emanating from a vehicle in Nebraska has firsthand information that provides an objectively reasonable basis to suspect contraband will be found in the vehicle. Assuming the vehicle is readily mobile, the odor of marijuana alone provides probable cause to search the vehicle under the automobile exception to the warrant requirement.

23. **Witnesses: Evidence: Records: Telecommunications.** The records custodian employed by a social media platform can attest to the accuracy of only certain aspects of the communications exchanged over that platform, that is, confirmation that the depicted communications took place between certain accounts, on particular dates, or at particular times.

24. **Rules of Evidence: Records: Telecommunications.** Social media communications are not business records that may be "self-authenticated" by way of a certificate from a records custodian under Neb. Rev. Stat. § 27-902(11) (Cum. Supp. 2024).

25. **Rules of Evidence: Telecommunications.** Extrinsic evidence may be used to authenticate the substantive content of social media communications under Neb. Rev. Stat. § 27-901 (Reissue 2016).

26. **Rules of Evidence: Telecommunications: Hearsay.** Once authenticated, social media content authored by a defendant is admissible as an admission by a party opponent under Neb. Rev. Stat. § 27-801(4)(b) (Cum. Supp. 2024).

27. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

28. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

29. **Criminal Law: Jury Instructions.** When there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give that instruction to the jury in a criminal case.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Affirmed.

Robert Wm. Chapin, Jr., for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

Pirtle, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Following a jury trial, Shaquille M. Falcon was convicted of possession of a firearm by a prohibited person and driving under the influence (DUI). The Lancaster County District Court sentenced Falcon to consecutive terms of 8 to 12 years' imprisonment and 30 to 60 days' imprisonment. On appeal, Falcon challenges the district court's denial of his motion to suppress evidence, its allowance of certain exhibits at trial, and one of the court's jury instructions. Falcon also contends there was not sufficient evidence to support his convictions. We affirm.

## II. BACKGROUND

In the early morning hours of January 1, 2022, a law enforcement officer responded to a call for service regarding a "traffic hazard . . . for a vehicle that had been parked or driven up onto some railroad tracks, and it was an active railway."

When the officer arrived on the scene, the two individuals from the vehicle (Falcon and Rudy Martinez) were seated in a bystander's van because of the cold weather. Upon making contact with Falcon, the officer immediately observed signs of intoxication. Falcon and Martinez were moved to the police cruiser so that the bystander could leave. The officer then began a DUI investigation of Falcon, who had admitted that he was the driver of the vehicle on the railroad tracks. Martinez was subsequently allowed to leave the scene, but he returned to look for his keys that he believed were in the vehicle on the railroad tracks. Law enforcement officers escorted Martinez to the vehicle to help him find his keys, and a handgun was found in the center console of the vehicle.

On May 4, 2022, the State filed an information charging Falcon with two counts: count 1, possession of a firearm by a prohibited person, in violation of Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2022), a Class ID felony, and count 2, "DUI- .15+," in violation of Neb. Rev. Stat. §§ 60-6,196 and 60-6,197.03(2) (Reissue 2021), a Class W misdemeanor. The record indicates the information was subsequently amended so that count 2 charged Falcon with DUI, .08 grams of alcohol per 210 liters of breath, first offense.

1. MOTION TO SUPPRESS

On August 1, 2022, Falcon filed a motion to suppress evidence seized from his person, his living quarters, his motor vehicle, or any other place in which he had an expectation of privacy. That same day, he also filed a motion to suppress statements, admissions, or confessions that he made which were not made voluntarily, intelligently, or understandingly, or which were obtained in violation of his constitutional rights. Hearings on the motions to suppress were held on September 15, 2022, and March 1, 2023.

At the suppression hearing on September 15, 2022, Falcon's counsel stated, "I did file a motion to suppress evidence, as well as a motion to suppress statements. . . . [W]ith regard to evidence, I would be asking the court to focus on probable

cause for arrest, as well as the search of the vehicle involved in this case, primarily."

Officer Alyssa Dirks of the Lincoln Police Department (LPD) testified that in the early morning hours of January 1, 2022, she responded to a call for service regarding a vehicle on railroad tracks. As described above, Falcon and Martinez were in a bystander's van because of the cold weather. Officer Dirks contacted Falcon, who was in the front passenger's seat of the bystander's van; she was wearing a body camera at the time, and the video footage was received into evidence. The video footage shows that Officer Dirks asked, "What happened?" She also asked, "Who was driving?" Falcon responded, "I was."

Officer Dirks testified that she asked Falcon how the vehicle ended up on the railroad tracks and that she "was able to immediately observe that he was under the influence of what [she] assumed was alcohol." He had "[s]lurred speech" and "[v]ery slow, slow movements." When Falcon and Martinez were taken to Officer Dirks' cruiser because of the weather, Falcon was "stumbling." Falcon and Martinez were searched and then seated in the back seat of the cruiser.

While seated in the cruiser, Officer Dirks called for a tow truck because she was told the vehicle was "high centered and there was no way to drive it off the tracks." She also began her DUI investigation, looked Falcon and Martinez up in the LPD "local system," and saw that Falcon "had a broadcast out for him, a cite and lodge broadcast" for a domestic assault. Other law enforcement officers arrived on the scene and dealt with Martinez. Officer Dirks gave Falcon a preliminary breath test. The body camera footage shows that after she told Falcon the results of the preliminary breath test and that he was above the legal limit to drive, he asked her, "Who told you I was driving?" She responded, "You did. . . . It's on my body cam." The footage also shows that Falcon stated that he did not want to talk and that he would speak to his lawyer. At the hearing, Officer Dirks confirmed that Falcon invoked

"his rights" and that she did not read him *Miranda* warnings; "he invoked before [she] read them." She testified that she informed Falcon that he was under arrest for DUI (the video footage shows that she told him that he was going to jail for DUI, domestic assault, and the gun in the vehicle). After Falcon was taken to the jail, a "DataMaster" instrument was used "for the official reading on the DUI."

Officer Dirks was asked about LPD's policy for inventory searches when a vehicle is towed. She responded, "If a vehicle is being towed, we are allowed to search it, which is the inventory search, for valuable items that we just need to document or take into our property so there's a report if anything gets stolen." She was then asked if there are times after a probable cause search that an additional inventory search will not be done, because the vehicle had already been searched and any valuables found; she replied in the affirmative. When asked, "[I]n this case, if there had not been a probable cause search, do you believe there needed to be an inventory search?" Officer Dirks replied, "Yes."

After Officer Dirks was excused as a witness, the district court and counsel for both parties discussed how to proceed with the remaining time available that day. The court stated, "Doesn't look like we reserved enough time. . . . I'll let you argue the [suppression of] statements portion of this. . . . And then maybe we can reset[.]" After hearing arguments from the State and Falcon, the court ruled from the bench that Falcon's statements prior to his request for an attorney should not be suppressed. When the State asked for clarification regarding what, if anything, was suppressed, the court responded, "Anything past the point where he says he wants an attorney. I don't think there are any statements after that."

On March 1, 2023, the district court stated, "Before the court for hearing this morning is [Falcon's] motion to suppress evidence." It continued:

> [Falcon has] also filed . . . a motion to suppress statements. It is my understanding that that particular motion

was heard before [a different judge] prior to [that judge's] retirement, and that he had reached a conclusion as to that motion.

. . . .

. . . So the motion to suppress evidence is what we're here on today.

The State said it wanted the record "to be clear what exact evidence [the defense was] asking to suppress." The State "assume[d] it's the firearm that is found in the vehicle at issue in this case," but pointed out "[t]he motion to suppress evidence doesn't specifically state that." Falcon's counsel responded, "We are objecting to a warrantless search of a vehicle where a firearm was found."

Officer Dirks' testimony from the September 15, 2022, suppression hearing, along with the video footage from her body camera, was received into evidence.

LPD Officer Brian Gruber testified that in the early morning hours of January 1, 2022, he was requested to assist on a call for service regarding a vehicle that was stuck on railroad tracks near the intersection of 1st and F Streets. When he arrived at the scene, he observed the vehicle, a gold Cadillac, on the railroad tracks and Falcon and Martinez in the back seat of Officer Dirks' police cruiser. Officer Dirks informed Officer Gruber that she was conducting a DUI investigation with Falcon and that Martinez was being uncooperative and needed to be escorted away from the scene; Officer Gruber confirmed that he assumed Falcon was the driver, because Officer Dirks was doing a DUI investigation of him. Martinez was let out of the cruiser, was told to leave, and walked away from the scene. However, a short time later, Martinez returned to the scene and stated that he needed his house keys that he thought were in the vehicle; at the time, Officer Gruber did not know the identity of the registered owner of the vehicle.

Officer Gruber testified he walked to the vehicle with Martinez because he did not know if the vehicle had been searched and because "entering a car, especially somebody

who is uncooperative, there could have been a weapon or something else in the vehicle that he could have had access to." LPD Officer Kathleen Brandt, who had also arrived on the scene, followed them to the vehicle. When they got to the vehicle, Officer Gruber opened the front passenger-side door and Martinez opened the back passenger-side door; video footage shows that the back door was opened 1 or 2 seconds after the front door was opened. At that point, Officer Gruber noticed "a strong odor of marijuana coming from inside of the vehicle."

The video footage from Officer Gruber's body camera was received into evidence and shows that once Martinez and Officer Gruber opened the vehicle's doors, Martinez climbed in the back seat to look for his keys and then leaned over the front seat to look; it was dark outside, and Officer Gruber shined a light in the vehicle for Martinez. Officer Gruber asked Martinez if his keys were the keys in the ignition, and Martinez said, "No." Martinez then pointed to the front passenger-side floor and asked Officer Gruber, "Can you go that way?" (Officer Gruber testified, "I interpreted that as [Martinez] couldn't reach that area and wanted me to look into that area. Or, at a minimum, shine my light into that area so he could see.") In the video, Officer Gruber pointed his light on the front passenger-side floor and said, "This way down here?" Officer Gruber reached his hand forward for 2 seconds and shuffled through what appears to be trash on the floor. Martinez asked, "Nothing?" Officer Gruber responded, "No, man." Officer Gruber then asked if Martinez' keys would be in the center console; Martinez' response is inaudible. (Video footage from Officer Brandt's body camera shows that Martinez leaned back to the back seat at that time.) It appears on video footage from both officers' body cameras that at that point, Officer Gruber leaned into or entered the vehicle.

Officer Gruber testified, "I had opened the top center console and observed a firearm." He testified Martinez was then taken into custody "[d]ue to there being a firearm inside the

vehicle." Officer Gruber stated it was his understanding that Martinez was a passenger in the vehicle, "so there are more investigative steps to take to identify if he was in the [vehicle] for sure or if it was his firearm"; at that point, Officer Gruber was not aware of the criminal histories of either Falcon or Martinez. Martinez was placed into a police cruiser, and Officer Gruber continued to search through the vehicle. (On cross-examination, Officer Gruber confirmed that during his deposition, he had indicated that Martinez never asked for help looking for his keys. Officer Gruber also confirmed that during his deposition, he said that he noted the odor of marijuana after Martinez opened the door and that he was going to search the vehicle regardless once he smelled the odor of marijuana.)

Officer Gruber was asked if at any point, either when he came back to the cruiser to look through it or earlier, he found any other contraband in the vehicle. He said that he observed "at least one small, like, marijuana roach near the gear shift." He did not specifically collect or photograph the "roach" even though "[t]ypically we would," because "[a]t that time I was focused on the firearm." Officer Gruber learned that the firearm was not stolen. He testified that "there was one casing in the firearm and . . . nine in the magazine." When asked if the firearm was registered to anyone, Officer Gruber replied, "Not that I could recall."

There was not a "tow report" completed in this case, which Officer Gruber attributed to "an officer error for the main investigating officer." Officer Gruber stated, "[A] tow report is a report that we complete so that [the towing company] knows when to release the vehicle and who to release it to. . . . And it also typically contains an inventory from the vehicle." Officer Gruber did not complete a tow report because he "was focused on the firearm and then left the scene prior to the vehicle being towed."

The State asked, "Let's say . . . Martinez never comes back to the scene and you never go into the [vehicle] to search for

his keys. What would have been done with the vehicle in that scenario?" Officer Gruber responded, "The vehicle would have been towed to [the towing company]. Inventory would have been completed and a tow report would have been completed for the vehicle." Officer Gruber also confirmed that if Martinez had not come back, he would not have found or been focused on the firearm. He "would have at least asked if [the inventory and tow report] had been completed or needed to be completed." According to Officer Gruber, "an inventory search was not completed" in this case because "[b]ased on opening the doors and smelling the odor of marijuana and then furthermore finding the firearm, it was a probable cause search of the vehicle."

During a followup on the investigation, Officer Gruber learned that the vehicle was registered to Christine Dawson. He later discovered that Dawson was the mother of Mariah Williams and that Falcon and Williams either were or had been in a dating relationship.

Williams testified that she had owned the vehicle since approximately March 2021 and that she "let a lot of people borrow [the vehicle]." She let a friend borrow the vehicle on "New Year's," and that friend let Falcon borrow it. On January 2, 2022, Williams and Dawson retrieved the vehicle from the towing company. When asked if she noted the odor of marijuana, Willaims replied, "No." Williams stated that the firearm found in the vehicle belonged to her; she "had it in the middle console" and "completely forgot about it." Williams described Falcon as "a friend of the family" but said she had not known him very long. She met him when her brother passed away; she was "[p]retty sure" her brother and Falcon were cousins. When asked if she and Falcon had ever been involved in a "romantic dating" relationship, Williams replied, "No."

Martinez did not testify at the suppression hearing, but his deposition testimony from October 27, 2022, was received into evidence. In his deposition, Martinez testified that Falcon picked him up in a Cadillac on New Year's Eve. After driving

around for a while, they ended up going to a club. Martinez thought they got to the club at "maybe eleven, 11:30" p.m. When asked if they stayed until the club closed, Martinez replied, "I think so," but then said, "I don't remember," "I remember they turned the lights on." Martinez had "[q]uite a bit" to drink that night and "did some other drugs." He also saw Falcon drinking that night. After leaving the club, Falcon and Martinez rode in the back seat of some other people's car, but after a while, Falcon and Martinez were dropped off at the Cadillac.

Martinez testified that after they got back in the Cadillac, Falcon drove; Falcon "was drunk" and "was swerving pretty good." Martinez remembered "passing out for a while and waking up again, and [becoming aware they were] still driving around." Falcon "pulled off to the side of the road, and that's where [they] got high-centered . . . and then . . . both passed out." Martinez did not know what time they got "high-centered." He testified, "I remember waking up to the window getting knocked on" by a bystander "[a]nd the [bystander] is like, 'Hey, you guys are stuck on the railroad tracks. This is an active railroad track.'" Martinez and Falcon then got into the bystander's van, Martinez fell asleep again, "and that's whenever the police and them showed up."

Martinez testified that after the officer told him he could leave, he got "a block away" and then turned back because he did not have his keys, phone, or wallet. He asked the officer to escort him to get his things out of the vehicle on the railroad tracks. Martinez said he told the officer, "'[Y]ou guys are going to have to help me find my keys 'cause . . . I ain't going nowhere in this weather without a way to get in my apartment.'" Officers walked him to the vehicle, and "they already had . . . the car doors open." When asked during his deposition if he noticed at any point that the vehicle smelled like marijuana when he was in it, Martinez replied, "Not at all 'cause [Falcon] don't let no one smoke in his car, and he don't smoke [marijuana]." Martinez testified he did not know

that there was a gun in the vehicle and had not seen Falcon with a gun that night.

In its order entered on April 13, 2023, the district court overruled Falcon's motion to suppress evidence, because the odor of marijuana provided probable cause to search the vehicle.

## 2. TRIAL

A jury trial was held over 4 days in September 2023. The parties stipulated that Falcon had a prior felony conviction. Falcon also preserved his motion to suppress.

Officer Dirks gave testimony that was similar to her testimony at the suppression hearing. She said she responded to a traffic hazard call shortly before 6 a.m. on January 1, 2022; a vehicle was on active railroad tracks. She began to interview Falcon about how the vehicle ended up on the tracks, but the bystander wanted to leave. Falcon and Martinez voluntarily agreed to go into the back seat of Officer Dirks' cruiser so that she could continue her investigation. Falcon "almost fell" getting out of the bystander's van, and he had slurred speech and "very slow"-paced actions. Officer Dirks stated that Falcon "admitted to driving the vehicle," so she began a DUI investigation.

Officer Dirks stated that while in the cruiser, Martinez "started to become belligerent" so she called for another officer to come to the scene "for safety concerns." Officers Brandt and Gruber responded, and Martinez was released from Officer Dirks' cruiser. Officer Dirks continued her DUI investigation of Falcon, and she gave him a "portable breath test." At some point, Officer Dirks was informed that a firearm was found in the vehicle. Falcon was transported to the jail because there was "probable cause to . . . cite him for the DUI" and because the officers had learned he was a felon and was therefore "not allowed to have a firearm." A redacted version of the video from Officer Dirks' body camera was received into evidence.

At the jail, Officer Dirks administered the DataMaster test to get an official reading of Falcon's breath alcohol content,

which was .157 grams of alcohol per 210 liters of breath on January 1, 2022, at 7:37 a.m. (After the defense rested its case at trial, the State and the defense stipulated that "with the margin of error of the DataMaster, the reading would be [.14915 grams of alcohol per 210 liters of breath].")

Officer Gruber also gave testimony that was similar to his testimony at the suppression hearing. On January 1, 2022, he responded to Officer Dirks' request for backup. When he arrived, he observed the vehicle stuck on the railroad tracks and two individuals (Falcon and Martinez) in the back of Officer Dirks' cruiser. Officer Brandt also arrived on the scene. Officer Dirks was conducting a DUI investigation involving Falcon, and she needed assistance getting Martinez out of the area. Officer Gruber escorted Martinez away from Officer Dirks' cruiser and told him to leave. Martinez walked away but returned "[w]ithin a minute" because he had lost his house keys and thought they might be in the vehicle. Officers Gruber and Brandt walked with Martinez to the vehicle. Officer Gruber testified, "The doors were open and [one] could smell the odor of marijuana, and then I began helping him search for the keys." Officer Gruber "was on the front seat, passenger seat, and . . . Martinez was in the back seat with Officer Brandt looking for the keys." Officer Gruber observed "[a] small roach with marijuana residue" in an ashtray in front of the gearshift. And while he was searching in the front passenger compartment for the keys, he "opened the center console and observed a firearm." Martinez was then handcuffed and placed into Officer Brandt's cruiser, and then Officer Gruber returned to the vehicle to collect the firearm; the firearm had nine bullets in the magazine and one bullet in the chamber. Officer Gruber removed the magazine from the firearm and pulled the slide back to eject the bullet in the chamber so that the firearm was safe. (Officer Gruber was wearing winter gloves at the time; he was not wearing rubber gloves as he was trained to do to preserve any DNA or fingerprints.) The vehicle was searched, and then it was towed. A redacted

version of the video from Officer Gruber's body camera was received into evidence.

Officer Gruber testified that he received the results from the fingerprint analysis of the firearm, and he confirmed that there were no latent prints of value for a comparison. The forensic scientist who analyzed the DNA found on the firearm testified that "[a] mixture of at least four individuals was detected" and that "due to the complexity of the sample, no comparisons were made." According to Officer Gruber, the serial number from the firearm was run through a database to make sure that it was not stolen, and the firearm was not listed as stolen. The firearm "came back to someone in Indiana," but attempts to contact that person were unsuccessful.

Officer Gruber stated that the vehicle was picked up from the towing company on January 1, 2022. Dawson was the registered owner of the vehicle on the day of the incident, but it was subsequently registered to Williams (Dawson's daughter). "[B]ased on this investigation," it was discovered that Falcon and Williams "were in some sort of dating relationship." Officer Gruber also learned of a traffic stop that occurred prior to January 1 where Falcon was driving the same vehicle.

An LPD sergeant testified that on December 12, 2021, he conducted a traffic stop of a gold Cadillac. Falcon was the driver and lone occupant of that vehicle at the time; however, the vehicle was registered to Williams. Falcon was issued a written warning for a traffic violation.

Officer Gruber testified that he authored search warrants for Falcon's social media accounts. When asked how he identified an account as belonging to Falcon, Officer Gruber responded, "It was through a court [deposition] with . . . Martinez where he identified the account name, and then I was able to pull that account up on Face[b]ook and verify that the Face[b]ook profile was . . . Falcon." The name on the Facebook account was "Shaquille Falcon, Sr.," and Officer Gruber "looked at the main profile picture and observed that it was . . . Falcon, and then went through other photographs on

the account and observed other photographs of him." Officer Gruber obtained a search warrant for the Facebook account, sent it to Facebook, and Facebook sent back a confirmation of having received the warrant. Officer Gruber subsequently received a search warrant return from Facebook with the requested information, and he went through the information. Various parts of that information were received into evidence, including a message thread between Falcon and another person on the night of December 30, 2021. Falcon wrote, "Is you going all the way legit because I be havin the blick on me?" He also wrote, "Just checking bro, I don't want to put anyone in a situation they don't want to be in." In a message thread between Falcon and a different individual shortly before noon on December 31, Falcon wrote, "Fell asleep in the car with the blick and a bag on me." According to Officer Gruber, "Blick is a slang term for a firearm."

Martinez was called as a witness for the defense. He confirmed that he was a convicted felon. Martinez testified that on December 31, 2021, Falcon was driving "his Cadillac" when he picked Martinez up and they went to a club. Martinez stated "I tried some PCP. I done some acid that night, . . . some shrooms and a lot of alcohol, some cocaine and meth . . . pretty much did everything that night." When asked if he smoked any marijuana that evening, Martinez replied, "I'm not sure. Probably so. I smoked [marijuana] daily." Martinez stated that Falcon "don't smoke [marijuana]" and "told [him] that [he] can't smoke [marijuana] in [Falcon's] car." After they left the club, they drove around; Falcon was driving. Martinez did not see a gun in the vehicle, nor did Falcon mention there was a gun in the vehicle. When asked if he remembered a time when the vehicle was on the railroad tracks and the police eventually came, Martinez replied, "Yeah." Martinez remembered that the police let him leave but that he came back for his house keys. When asked if he would have come back to the vehicle if he had known there was a gun in the vehicle, Martinez replied, "No." On cross-examination,

Martinez was impeached with audio from body camera footage during the following exchange:

Q [by the State:] All right. So, in fact you did tell Officer Brandt that that's not my gun and I had seen him with it that night and it's not mine?

A [by Martinez:] Yes.

. . . .

Q . . . So, in fact you did tell the police that you know . . . Falcon to carry a gun, is that right?

A Yes.

. . . .

Q And in fact you said that at least two, maybe three times, that he was waving the gun around that night, correct?

A Yes.

However, Martinez testified, "[N]one of that's true. . . . I couldn't say that 'cause I didn't see it. . . . I never seen the gun or nothing."

### 3. Jury Verdicts and Sentencing

The jury found Falcon guilty of count 1, possession of a firearm by a prohibited person, and count 2, DUI. The district court accepted the verdicts and entered judgment accordingly.

In October 2023, the district court sentenced Falcon to consecutive sentences of 8 to 12 years' imprisonment on count 1 and 30 to 60 days' imprisonment on count 2. He was given 304 days' credit for time served. Falcon was also ordered to pay a $500 fine, and his driver's license was revoked for 6 months.

Falcon appeals.

## III. ASSIGNMENTS OF ERROR

Falcon assigns, reordered and restated, that the district court erred by (1) not suppressing evidence; (2) allowing exhibits 55 through 61 and 63 through 66, because they "lacked foundation," "were altered by the State," and "deprived [him] the right to confront the person who allegedly put the exhibit

together”; and (3) allowing “Jury Instruction #4.” Falcon also assigns that (4) there was insufficient evidence to support his convictions.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court’s ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Hoehn*, 316 Neb. 634, 6 N.W.3d 487 (2024). Regarding historical facts, an appellate court reviews the trial court’s findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court’s determination. *State v. Hoehn, supra*.

[2,3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

[4,5] Whether jury instructions given by a trial court are correct is a question of law. *State v. Gonzalez*, 313 Neb. 520, 985 N.W.2d 22 (2023). When reviewing questions of law, we resolve the questions independently of the lower court’s conclusions. *Id.*

[6] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. *State v. Kalita*, 317 Neb. 906, 12 N.W.3d 499 (2024).

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Falcon argues that the district court erred by not suppressing the evidence that was found in his vehicle because "[t]here were no search warrants issued to search the vehicle nor . . . was there any probable cause or reasonable suspicion to believe any criminal act was involved except a possible DUI." Brief for appellant at 14. Falcon also argues that "[t]he notice of marijuana smell is purely pretextual," *id.*, and that Martinez and Williams "indicated there was no marijuana use or smell in the [vehicle]," *id.* at 15.

[7-10] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *State v. Hammond*, 315 Neb. 362, 996 N.W.2d 270 (2023). The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *Id.* It is the State's burden to show that a search falls within an exception to the warrant requirement. *Id.* Nebraska has also recognized that among the established exceptions to the warrant requirement is the automobile exception. *State v. Vaughn*, 314 Neb. 167, 989 N.W.2d 378 (2023).

Here, the State relies on consent, the automobile exception, and inevitable discovery (by way of an inventory search).

### (a) Consent

[11-14] Generally, to be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne. *State v. Hammond, supra.* Consent must be given voluntarily

and not as a result of duress or coercion, whether express, implied, physical, or psychological. *Id.* The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law. *State v. Hammond, supra*. Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent. *Id.*

[15-17] When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. *State v. Andera*, 307 Neb. 686, 950 N.W.2d 102 (2020). Furthermore, a warrantless search is valid when based upon consent of a third party whom the police, at the time of the search, reasonably believed possessed authority to consent to a search of the premises, even if it is later demonstrated that the individual did not possess such authority. *Id.* The search of property based on consent by a third party must """be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a [person] of reasonable caution in the belief'" that the consenting party had authority over the [property]?'" *Id.* at 691, 950 N.W.2d at 107 (ellipsis in original). Consent to search may be implied by action rather than words. *State v. Hammond, supra*.

There is no dispute that when Officer Gruber arrived on the scene, Falcon and Martinez were in the back of Officer Dirks' cruiser; Falcon remained in the cruiser until he was taken to jail. Officer Gruber confirmed that he assumed Falcon was the driver of the vehicle because Officer Dirks was doing a DUI investigation of him. Martinez was then told to leave the scene. In his deposition, Martinez testified that after the officer told him he could leave, he got "a block away" and then turned back because he did not have his keys, phone, or wallet. He asked the officer to escort him to get his things

out of the vehicle. Martinez said he told the officer, "'[Y]ou guys are going to have to help me find my keys 'cause . . . I ain't going nowhere in this weather without a way to get in my apartment.'" Officer Gruber testified that when they got to the vehicle, he opened the front passenger-side door and Martinez opened the back passenger-side door; the video shows that the back door was opened 1 or 2 seconds after the front door was opened.

The video footage from Officer Gruber's body camera was received into evidence and shows that once Martinez and Officer Gruber opened the vehicle's doors, Martinez climbed in the back seat to look for his keys and then leaned over the front seat to look; it was dark outside, and Officer Gruber shined a light in the vehicle for Martinez. Officer Gruber asked Martinez if his keys were the keys in the ignition, and Martinez said, "No." Martinez then pointed to the front passenger-side floor and asked Officer Gruber, "Can you go that way?" (Officer Gruber testified, "I interpreted that as [Martinez] couldn't reach that area and wanted me to look into that area. Or, at a minimum, shine my light into that area so he could see.") In the video, Officer Gruber pointed his light on the front passenger-side floor and said, "This way down here?" Officer Gruber reached his hand forward for 2 seconds and shuffled through what appears to be trash on the floor. Martinez asked, "Nothing?" Officer Gruber responded, "No, man." Officer Gruber then asked if Martinez' keys would be in the center console; Martinez' response is inaudible. (Video footage from Officer Brandt's body camera shows that Martinez leaned back to the back seat at that time.) It appears on video footage from both officers' body cameras that at that point, Officer Gruber leaned into or entered the vehicle. Officer Gruber testified that he "opened the top center console and observed a firearm."

We find that under the circumstances of this case, it was reasonable for Officer Gruber to believe that Martinez had authority to consent to the search of the vehicle of which he

had been a passenger in order to help locate his house keys. Additionally, there is no evidence to suggest that Martinez' consent was anything other than voluntary. We agree with the State's argument that Officer Gruber did not exceed the scope of Martinez' consent, "because he searched areas Martinez directed him to and areas where keys could reasonably belong—including the center console," and "[a]t no time did Martinez withdraw his consent or indicate that Officer Gruber had exceeded any consent given." Brief for appellee at 28.

### (b) Probable Cause

The State further argues that "Officer Gruber also obtained probable cause to search the vehicle once he opened the door with Martinez's consent." Brief for appellee at 28.

[18,19] The automobile exception to the warrant requirement applies when a vehicle is readily mobile and there is probable cause to believe that contraband or evidence of a crime will be found in the vehicle. *State v. Seckinger*, 301 Neb. 963, 920 N.W.2d 842 (2018). The Nebraska Supreme Court has stated:

> In light of the overwhelming weight of authorities, we hold that the requirement of ready mobility for the automobile exception is met whenever a vehicle that is not located on private property is capable or apparently capable of being driven on the roads or highways. This inquiry does not focus on the likelihood of the vehicle's being moved under the particular circumstances and is generally satisfied by the inherent mobility of all operational vehicles. It does not depend on whether the defendant has access to the vehicle at the time of the search or is in custody, nor on whether the vehicle has been impounded. The purpose of the ready mobility requirement is to distinguish vehicles on public property from fixed, permanent structures, in which there is a greater reasonable expectation of privacy.

*State v. Rocha*, 295 Neb. 716, 755, 890 N.W.2d 178, 207 (2017). See *State v. Alarcon-Chavez*, 284 Neb. 322, 821 N.W.2d

359 (2012) (concluding vehicle was operational and therefore readily movable). See, also, *U.S. v. Watts*, 329 F.3d 1282 (11th Cir. 2003) (all that is necessary to satisfy that automobile is readily mobile is that it is operational); *U.S. v. Mercado*, 307 F.3d 1226 (10th Cir. 2002) (finding car temporarily immobile with mechanical problems had not lost its inherent mobility; also cited to unpublished Eighth Circuit case that held truck stuck in ditch had not lost its inherent mobility).

[20,21] Probable cause to search requires that the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of a crime will be found. *State v. Seckinger, supra*. Probable cause may result from any of the senses, and an officer is entitled to rely on his or her sense of smell in determining whether contraband is present in a vehicle. *State v. Vaughn*, 314 Neb. 167, 989 N.W.2d 378 (2023).

[22] Because of marijuana's legal status as contraband, a trained officer who detects the odor of marijuana emanating from a vehicle in Nebraska has firsthand information that provides an objectively reasonable basis to suspect contraband will be found in the vehicle. *State v. Seckinger, supra*. Assuming the vehicle is readily mobile, the odor of marijuana alone provides probable cause to search the vehicle under the automobile exception to the warrant requirement. *Id.*

Here, the automobile exception to the warrant requirement applies because the vehicle was readily mobile and there was probable cause to believe that contraband or evidence of a crime would be found in the vehicle. See *id*. The vehicle was readily mobile; even though the vehicle was allegedly high centered on the railroad tracks, it had not lost its inherent mobility. Officer Gruber walked Martinez to the vehicle so that Martinez could look for his keys. Officer Gruber opened the front passenger-side door of the vehicle and Martinez opened the rear passenger-side door. Officer Gruber noted the odor of marijuana after Martinez opened the rear door. The odor of marijuana provided Officer Gruber probable cause to

search the vehicle. Accordingly, the motion to suppress was properly denied in this case.

### (c) Inevitable Discovery

Because we have already determined that the motion to suppress was properly denied in this case, we need not address the State's inventory search or inevitable discovery argument. *State v. Brennauer*, 314 Neb. 782, 993 N.W.2d 305 (2023) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

### 2. Admission of Exhibits

Falcon argues that the district court erred by admitting the Facebook evidence, specifically exhibits 55 through 61 and 63 through 66. Falcon contends the evidence "lacked foundation and denied [him] the right to confront the person putting the documents together to verify their authenticity." Brief for appellant at 17.

Exhibit 55 is a "Certificate of Authenticity of Domestic Records of Regularly Conducted Activity" completed by Austin Walker on December 2, 2022. Walker certified that he was employed by Meta Platforms, Inc. (Meta); was "a duly authorized custodian of records for Meta"; and was "qualified to certify Meta domestic records of regularly conducted activity." Walker stated that he had reviewed the records by Meta in this matter in response to the search warrant and that "[t]he records provided are an exact copy of the records that were made and kept by the automated systems of Meta in the course of regularly conducted activity as a regular practice of Meta." Exhibit 56 was the search warrant return from Meta containing over 1,500 pages. Exhibits 57 through 61 and 63 through 66 were specific portions of the information from exhibit 56.

At trial, Officer Gruber confirmed that exhibit 55 validated the records in exhibit 56. When the State offered exhibits 55 and 56 into evidence, Falcon objected based on hearsay,

foundation, and violation of his right to confront the witness. In response, the State said:

> Your Honor, this certification is pursuant to a new law that is now in effect as of September 2nd, I believe, authorizing a certification by a custodian of records through an affidavit or a document of certification, which no longer requires that a person from Face[b]ook come and personally testify. It's in line with the federal rules of evidence, as well as 33 other states.
>
> So, I would suggest to the Court that the records are now self-authenticating with that certification, which is Exhibit 55, I believe. And thus, the records of 56 can come in.

The State also argued:

> [T]his is a business record and this is specifically one of the reasons and instances that the Legislature this past session enacted this new hearsay exception. I know this because I was involved in that legislation and helped write it. And this was this very specific instance which the Legislature intended on using this for.
>
> Regarding confrontation, what I would end up offering from this are photographs from the account and messages and posts that . . . Falcon made. Other people's statements would be used for context of . . . Falcon's statements, so I don't believe there is a hearsay issue regarding that.
>
> The hearsay issue for the records is overcome by the hearsay exception to business records and that certification.

The district court overruled Falcon's objections and received exhibits 55 and 56. The court also overruled Falcon's foundation, relevancy, and hearsay objections to exhibits 57 through 61 and 63 through 66.

On appeal, the State argues:

> Rule 901 states that the requirement of authentication or identification as a condition precedent to admissibility

is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Neb. Rev. Stat. § 27-901 (Reissue 2016). Rule 901 does not erect a particularly high hurdle. . . .

Rule 902 provides for self-authentication of certain evidence. Relevant to this case, [Neb. Rev. Stat.] § 27-902(4) [(Cum. Supp. 2024)] provides that extrinsic evidence of authenticity is not required when a copy of an official record certified as correct by the custodian or other person authorized to make the certification is provided and § 27-902(11) provides that the original or a copy of a domestic record shown by a certification of the custodian or another qualified person that is made in the regular course of business under [Neb. Rev. Stat.] § 27-803(6) [(Cum. Supp. 2024)] can provide authentication. Exhibit 55 is a certificate of authenticity from the custodian of records from Meta—the parent company of Facebook—purporting to authenticate exhibit 56, which was the search warrant return from Falcon's Facebook.

Brief for appellee at 30-31.

The State acknowledges that "Nebraska has not yet commented on the self-authentication of social media accounts through § 27-902(11), as subsection (11) was only added to Nebraska's rule 902 in June 2023." Brief for appellee at 31. However, as noted by the State, Neb. Rev. Stat. § 27-902 (Cum. Supp. 2024) is similar to Fed. R. Evid. 902, and circuit courts have considered the issue. "Circuit Courts have determined that only non-content records from social media can be self-authenticated under rule 902 but social media content cannot be self-authenticated, so the content of those records must be authenticated under a standard rule 901 analysis." Brief for appellee at 31-32. See, *U.S. v. Lamm*, 5 F.4th 942 (8th Cir. 2021); *U.S. v. Browne*, 834 F.3d 403 (3d Cir. 2016). We note that Neb. Rev. Stat. §§ 27-901 and 27-803 (Reissue 2016) are similar to Fed. R. Evid. 901 and 803.

The Third Circuit has set forth a thorough analysis for the authentication of social media accounts that provides guidance on the issues raised in Falcon's case.

In *U.S. v. Browne, supra*, the Department of Homeland Security executed a search warrant on a specific Facebook account, which the defendant also admitted belonged to him, and Facebook provided five sets of chats and a certificate of authenticity executed by its records custodian. At trial, over defense counsel's objections, the federal district court admitted five Facebook chat logs and the certificate of authenticity into evidence. The certificate stated, in accordance with Fed. R. Evid. 902(11), that the records that Facebook had produced for the named accounts met the business records requirements of Fed. R. Evid. 803(6)(A) through (C). Tracking the language of Fed. R. Evid. 803(6), the custodian certified that the records "'were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook . . . [and] were made at or near the time the information was transmitted by the Facebook user.'" *U.S. v. Browne*, 834 F.3d at 406 (ellipsis in original). The defendant appealed, arguing that the Facebook records were not properly authenticated because the Government failed to establish that he was the person who authored the communications. More specifically, he argued that no witness identified the Facebook chat logs on the stand; nothing in the contents of the messages was uniquely known to the defendant; and the defendant was not the only individual with access to the Facebook account. The Government argued the Facebook records were business records that were properly authenticated pursuant to Fed. R. Evid. 902(11) by way of a certificate from Facebook's records custodian.

The Third Circuit stated:

> The proper authentication of social media records is an issue of first impression in this Court. In view of [the defendant's] challenge to the authentication and admissibility of the chat logs, our analysis proceeds in

three steps. First, as with non-digital records, we assess whether the communications at issue are, in their entirety, business records that may be "self-authenticated" by way of a certificate from a records custodian under Rule 902(11) of the Federal Rules of Evidence. Second, because we conclude that they are not, we consider whether the Government nonetheless provided sufficient extrinsic evidence to authenticate the records under a traditional Rule 901 analysis. And, finally, we address whether the chat logs, although properly authenticated, should have been excluded as inadmissible hearsay, as well as whether their admission was harmless.

*U.S. v. Browne*, 834 F.3d at 408.

[23] In assessing whether the communications were "self-authenticating," the Third Circuit stated:

To satisfy the requirement under Rule 901(a) of the Federal Rules of Evidence that all evidence be authenticated or identified prior to admission, the proponent of the evidence must offer "evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b), in turn, sets forth a non-exhaustive list of appropriate methods of authentication, including not only "[t]estimony that an item is what it is claimed to be," Fed. R. Evid. 901(b)(1), but also "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," Fed. R. Evid. 901(b)(4), and "[e]vidence describing a process or system and showing that it produces an accurate result," Fed. R. Evid. 901(b)(9).

The central dispute in this case is complicated, however, by the Government's contention that it authenticated the Facebook chat logs by way of Rule 902, under which extrinsic evidence is not required for certain documents that bear sufficient indicia of reliability as to be "self-authenticating." Specifically, the Government

relies on Rule 902(11), which provides that "records of a regularly conducted activity" that fall into the hearsay exception under Rule 803(6)—more commonly known as the "business records exception"—may be authenticated by way of a certificate from the records custodian, as long as the proponent of the evidence gives the adverse party reasonable notice and makes the record and certificate available for inspection in advance of trial. Fed. R. Evid. 902(11).

The viability of the Government's position turns on whether Facebook chat logs are the kinds of documents that are properly understood as records of a regularly conducted activity under Rule 803(6), such that they qualify for self-authentication under Rule 902(11). We conclude that they are not, and that any argument to the contrary misconceives the relationship between authentication and relevance, as well as the purpose of the business records exception to the hearsay rule.

First, to be admissible, evidence must be relevant, which means "its existence simply has some 'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'". . . Because evidence can have this tendency only if it is what the proponent claims it is, i.e., if it is authentic, . . . "Rule 901(a) treats preliminary questions of authentication and identification as matters of conditional relevance according to the standards of Rule 104(b)," . . . . Rule 104(b), in turn, provides that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). We have determined that to meet the Rule 104(b) standard of sufficiency, the proponent of the evidence must show that "the jury could reasonably find th[ose] facts . . . by a preponderance of the evidence." . . .

Here, the relevance of the Facebook records hinges on the fact of authorship. To authenticate the messages, the Government was therefore required to introduce enough evidence such that the jury could reasonably find, by a preponderance of the evidence, that [the defendant] and the victims authored the Facebook messages at issue. The records custodian here, however, attested only that the communications took place as alleged between the named Facebook accounts. Thus, accepting the Government's contention that it fulfilled its authentication obligation simply by submitting such an attestation would amount to holding that social media evidence need not be subjected to a "relevance" assessment prior to admission. Our sister Circuits have rejected this proposition in both the digital and non-digital contexts, as do we. . . .

The Government's theory of self-authentication also fails for a second reason: it is predicated on a misunderstanding of the business records exception itself. Rule 803(6) is designed to capture records that are likely accurate and reliable in content, as demonstrated by the trustworthiness of the underlying sources of information and the process by which and purposes for which that information is recorded. . . .

Here, Facebook does not purport to verify or rely on the substantive contents of the communications in the course of its business. At most, the records custodian employed by the social media platform can attest to the accuracy of only certain aspects of the communications exchanged over that platform, that is, confirmation that the depicted communications took place between certain Facebook accounts, on particular dates, or at particular times. This is no more sufficient to confirm the accuracy or reliability of the contents of the Facebook chats than a postal receipt would be to attest to the accuracy or reliability of the contents of the enclosed mailed letter. . . .

. . . .

. . . [T]he Facebook records are not business records under Rule 803(6) and thus cannot be authenticated by way of Rule 902(11). In fact, the Government's position would mean that all electronic information whose storage or transmission could be verified by a third-party service provider would be exempt from the hearsay rules— a novel proposition indeed, and one we are unwilling to espouse.

*U.S. v. Browne*, 834 F.3d 403, 408-11 (3d Cir. 2016).

[24] We agree with the Third Circuit's reasoning, and we likewise find that the Meta records at issue are not business records that may be "self-authenticated" by way of a certificate from a records custodian under § 27-902(11). Like in *Browne*, the relevance of the social media records depends on authorship. The "Certificate of Authenticity" in exhibit 55 does not allow the jury to find by a preponderance of evidence that Falcon authored the Facebook content at issue. In the "Certificate of Authenticity," the records custodian attested only that "[t]he records provided are an exact copy of the records that were made and kept by the automated systems of Meta in the course of regularly conducted activity as a regular practice of Meta" and that "[t]he records were made at or near the time the information was transmitted by the Meta user." Furthermore, like in *Browne*, the entity operating the social media platform does not purport to verify or rely on the substantive contents of the communications in the course of its business.

Because the Third Circuit found that the communications were not business records that may be self-authenticated by a certificate from a records custodian under Fed. R. Evid. 902(11), it next considered whether the Government nonetheless provided sufficient extrinsic evidence to authenticate the records under a traditional Fed. R. Evid. 901 analysis. The Third Circuit stated:

Our conclusion that the Facebook chat logs were not properly authenticated under Rule 902(11) does not end

our inquiry, for we may consider whether the Government has presented sufficient extrinsic evidence to authenticate the chat logs under Rule 901(a). . . . To answer this question, we look to what the rule means in the social media context and how it applies to the facts here.

Conventionally, authorship may be established for authentication purposes by way of a wide range of extrinsic evidence. *See* Fed. R. Evid. 901(b). . . .

. . . .

We hold today that it is no less proper to consider a wide range of evidence for the authentication of social media records than it is for more traditional documentary evidence. The authentication of electronically stored information in general requires consideration of the ways in which such data can be manipulated or corrupted, . . . and the authentication of social media evidence in particular presents some special challenges because of the great ease with which a social media account may be falsified or a legitimate account may be accessed by an imposter . . . . But the authentication rules do not lose their logical and legal force as a result. . . . Depending on the circumstances of the case, a variety of factors could help support or diminish the proponent's claims as to the authenticity of a document allegedly derived from a social media website, and the Rules of Evidence provide the courts with the appropriate framework within which to conduct that analysis.

Those Courts of Appeals that have considered the issue have reached the same conclusion. In *United States v. Barnes*, 803 F.3d 209 (5th Cir. 2015), the Fifth Circuit held that the government laid a sufficient foundation to support the admission of the defendant's Facebook messages under Rule 901 where a witness testified that she had seen the defendant using Facebook and that she recognized his Facebook account as well as his style of communicating as reflected in the disputed messages. *Id.*

at 217. In *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014), the Fourth Circuit held that the government properly linked the Facebook pages at issue to the defendants by using internet protocol addresses to trace the Facebook pages and accounts to the defendants' mailing and email addresses. *Id.* at 133. And in [*U.S. v.*] *Vayner*, the Second Circuit held that the government failed to adequately authenticate what it alleged was a printout of the defendant's profile page from a Russian social networking site where it offered no evidence to show that the defendant had created the page. 769 F.3d [125,] 131 [(2d Cir. 2014)]. In all of these cases, the courts considered a variety of extrinsic evidence to determine whether the government had met its authentication burden under Rule 901—each reiterating, in the course of that analysis, that conclusive proof of authenticity is not required and that the jury, not the court, is the ultimate arbiter of whether an item of evidence is what its proponent claims it to be. . . .

Applying the same approach here, we conclude the Government provided more than adequate extrinsic evidence to support that the disputed Facebook records reflected online conversations that took place between [the defendant and others], such that "the jury could reasonably find" the authenticity of the records "by a preponderance of the evidence." . . .

*U.S. v. Browne*, 834 F.3d 403, 411-13 (3d Cir. 2016). In *Browne*, the extrinsic evidence included the following: four witnesses who participated in the Facebook chats at issue offered detailed testimony about the exchanges that they had over Facebook which was consistent with the chat logs the Government introduced into evidence; the defendant made significant concessions that served to link him to the Facebook conversation, including that he owned the Facebook account; personal information that the defendant confirmed on the stand was consistent with personal details interspersed

throughout the Facebook conversation with the witnesses; and the Government supported the accuracy of the chat logs by obtaining them directly from Facebook and introducing a certificate attesting to their maintenance on Facebook's automated systems.

[25] We likewise consider whether the State has presented sufficient extrinsic evidence, which may be used to authenticate the substantive content of social media records like those at issue, under § 27-901. Pursuant to § 27-901(1), "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Section 27-901(2) provides illustrative examples of authentication or identification conforming to the requirements of the rule:

(a) Testimony that a matter is what it is claimed to be;

(b) Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation;

(c) Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated;

(d) Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances;

(e) Identification of a voice, whether heard first-hand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker;

(f) Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (i) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (ii) in the case of a business, the call was

made to a place of business and the conversation related to business reasonably transacted over the telephone;

(g) Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept;

(h) Evidence that a document or data compilation, in any form, (i) is in such condition as to create no suspicion concerning its authenticity, (ii) was in a place where it, if authentic, would likely be, and (iii) has been in existence thirty years or more at the time it is offered;

(i) Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result; and

(j) Any method of authentication or identification provided by act of the Legislature or by other rules adopted by the Supreme Court which are not in conflict with laws governing such matters.

Here, Officer Gruber testified that he authored search warrants for Falcon's social media accounts. When asked how he identified an account as belonging to Falcon, Officer Gruber responded, "It was through a court [deposition] with . . . Martinez where he identified the account name [Shaquille Falcon, Sr.], and then I was able to pull that account up on Face[b]ook and verify that the Face[b]ook profile was . . . Falcon." Officer Gruber "looked at the main profile picture and observed that it was . . . Falcon, and then went through other photographs on the account and observed other photographs of him." Officer Gruber sent a "preservation letter request to Face[b]ook" to "preserve[] the information back one year," received a response verifying it had been preserved, and then "drafted a search warrant for that account." After the search warrant was approved, Officer Gruber sent it to Meta, and Meta sent back a confirmation that it received the warrant. Officer

Gruber subsequently received a search warrant return from Meta with the requested information; through its law enforcement portal, Meta sent a link to the Facebook account information. Officer Gruber downloaded the information, "place[d] that on a CD," and then went through the information.

Officer Gruber stated that LPD received the search warrant return, a program converted the time stamps on the information to central standard time. Officer Gruber confirmed that exhibits 57 through 61 and 63 through 66 all came from exhibit 56. Upon inquiry of the district court, Officer Gruber confirmed that exhibits 57 through 61 and 63 through 66 were not changed from the original (other than to central standard time). Officer Gruber confirmed that Investigator Chris Fields converted the time. Investigator Fields, the electronic case manager for the criminal investigations unit at LPD, testified the Facebook return came in "universal time," "[s]o all the times in the records are off"; an analytic program converted the times to central standard time. Investigator Fields confirmed that the text of the conversations was not changed.

As noted previously, exhibits 57 through 61 and 63 through 66 were specific portions of the information from exhibit 56 (the full search warrant return containing more than 1,500 pages). Exhibit 66 contained a message thread from November 11, 2021, in which "Shaquille Falcon Sr." wrote that he was "outside the house right now" "[i]n gold lac." Officer Gruber testified that exhibit 65 contains a photograph of Falcon in which he appeared to be in the vehicle at issue, a gold Cadillac; Officer Gruber confirmed that information related to that photograph was posted by the author of the account on November 13. Exhibit 58 contains a message thread between "Shaquille Falcon Sr." and another individual, wherein on December 12, "Shaquille Falcon Sr." told the other individual, "Cash app me," and when the other individual asked for the number, "Shaquille Falcon Sr." responded with a particular "handle," which Officer Gruber knew to correspond to one of

Falcon's nicknames. In that same exhibit, a photograph was posted by "Shaquille Falcon Sr." on December 31 at 7:50 p.m.; Officer Gruber confirmed that the person in the photograph was Falcon and that he was wearing the same clothing that he was wearing when law enforcement contacted him on the morning of January 1, 2022. Exhibit 64 contained another photograph uploaded by "Shaquille Falcon Sr." on December 31, 2021, at 8:45 p.m.; Officer Gruber confirmed that the person in the photograph was Falcon and that he was in the same clothing he was wearing when law enforcement had contact with him on January 1, 2022. Additionally, Officer Gruber confirmed that one of the comments to the photograph was from "Martinez Strong," an account belonging to Martinez. Exhibit 59 contained a message thread between "Shaquille Falcon Sr." and "Martinez Strong" from December 31, 2021, after 10 p.m., wherein Martinez said, "I'll [r]ide," and Falcon later responded, "I'm 4 minutes away" and then, "I'm outside."

Based on the foregoing, we find that the State produced sufficient extrinsic evidence linking Falcon as the author of the Facebook content, and the Facebook exhibits were therefore properly authenticated under § 27-901.

In addressing the admissibility of social media records, the Third Circuit stated:

> Having concluded that the Facebook records were properly authenticated by way of extrinsic evidence, we turn to [the defendant's] more general argument that the records were inadmissible. Evidence that is properly authenticated may nonetheless be inadmissible hearsay if it contains out-of-court statements, written or oral, that are offered for the truth of the matter asserted and do not fall under any exception enumerated under Federal Rule of Evidence 802. . . .

> Here, the Government offered more than sufficient evidence to authenticate four of the five Facebook records as chats that [the defendant] himself participated in by way of the [specific Facebook] account, and these four

records were properly admitted as admissions by a party opponent under Rule 801(d)(2)(A).

*U.S. v. Browne*, 834 F.3d 403, 415 (3d Cir. 2016).

[26] As stated previously, the State provided sufficient evidence in the instant case to authenticate the Facebook account records. Once authenticated, any content authored by Falcon is admissible as an admission by a party opponent under Neb. Rev. Stat. § 27-801(4)(b) (Cum. Supp. 2024). This would include Facebook messages from December 30 and 31, 2021, when Falcon mentioned having a "blick" on him, which Officer Gruber explained was a "slang term for a firearm."

In summary, we find that the Facebook exhibits were properly admitted into evidence.

### 3. Jury Instruction

Falcon did not object to instruction No. 4 at trial. However, on appeal, he argues that the instruction amounted to plain error because the district court "should have instructed the jury as to [Falcon's] position that he claims to not have any knowledge of the firearm." Brief for appellant at 21. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *State v. Brown*, 317 Neb. 273, 9 N.W.3d 871 (2024).

[27,28] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. German*, 316 Neb. 841, 7 N.W.3d 206 (2024). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id*.

[29] During its instructions to the jury, the district court stated, in relevant part:

    Instruction No. 4: Count 1, possession of a firearm by a prohibited person. The material elements which the

State must prove by evidence beyond a reasonable doubt in order to convict . . . Falcon of possession of a firearm by a prohibited person are that . . . Falcon knowingly possessed a firearm; and that at the time . . . Falcon possessed the firearm he previously had been convicted of a felony; and that . . . Falcon did so on, about or between December 31st, 2021, and January 1st, 2022, in Lancaster County, Nebraska.

If you decide the State did prove each element of the charge of possession of a firearm by a prohibited person beyond a reasonable doubt, then you must find . . . Falcon guilty of possession of a firearm by a prohibited person; otherwise, you must find . . . Falcon not guilty.

. . . .

The burden of proof is always on the State to prove beyond a reasonable doubt the foregoing material elements of the crimes charged and this burden never shifts.

In instruction No. 5, the court provided definitions for various terms, including "knowingly"; Falcon does not assign error to instruction No. 5. The district court based its elements instruction (jury instruction No. 4) on NJI2d Crim. 3.0, and it was consistent with § 28-1206 (possession of a deadly weapon by a prohibited person). When there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give that instruction to the jury in a criminal case. *State v. German, supra.*

As noted by the State, "Falcon does not assert that the instruction as provided was an incorrect statement of the law or erroneous by itself but only argues that it also should have provided his opposing position." Brief for appellee at 39. "However, the instruction required the jury to find all elements beyond a reasonable doubt and if it did not find that Falcon knowingly possessed the firearm beyond a reasonable doubt, they were required to find him not guilty." *Id.* We agree with the State, and we find no plain error regarding jury instruction No. 4.

### 4. Sufficiency of Evidence

Falcon assigns that there was not sufficient evidence to support his convictions of possession of a firearm by a prohibited person and DUI.

### (a) Possession of Firearm
### by Prohibited Person

Pursuant to § 28-1206(1), and as relevant here, "A person commits the offense of possession of a deadly weapon by a prohibited person if he or she . . . [p]ossesses a firearm . . . and he or she . . . [h]as previously been convicted of a felony[.]" See, also, Neb. Rev. Stat. § 28-1212 (Reissue 2016) (presence in motor vehicle other than public vehicle of any firearm referred to in § 28-1206 shall be prima facie evidence that it is in possession of and is carried by all persons occupying such motor vehicle at time such firearm or instrument is found, except that this section shall not be applicable if such firearm or instrument is found upon person of one of occupants therein).

Falcon argues that the Facebook evidence used at trial to show that he was in possession of a firearm at some time was improperly admitted and that "[w]ithout that evidence there is no evidence to indicate that [he] had been or was in possession of the firearm found in the [vehicle]." Brief for appellant at 18. However, we have already found that the Facebook evidence was properly admitted. Falcon's other argument, that "[t]he evidence at trial is conjecture[;] [n]o one saw him with the gun," *id.*, goes to the weight and credibility of the evidence. See *State v. Kalita*, 317 Neb. 906, 12 N.W.3d 499 (2024) (appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact).

Viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Falcon's conviction. At trial, the evidence showed that a firearm was found in the center console of the vehicle, and

Falcon admitted to Officer Dirks that he had been driving that vehicle. Martinez also testified that Falcon was driving the vehicle that night. Although Martinez testified that he did not see a gun, he was impeached on cross-examination with audio from body camera footage wherein he told an officer that he knew Falcon carried a gun and had seen him waving the gun around that night. Additionally, in Facebook messages on December 30 and 31, 2021, Falcon mentioned having a "blick" on him, which Officer Gruber explained was a "slang term for a firearm." The parties stipulated that Falcon had a prior felony conviction. When viewed in the light most favorable to the prosecution, this evidence is sufficient such that a rational fact finder could have found the essential elements of the crime of possession of a firearm by a prohibited person beyond a reasonable doubt.

### (b) DUI

Pursuant to § 60-6,196(1), and as relevant here, "It shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle . . . [w]hen such person has a concentration of eight-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his or her breath."

Falcon did not specifically argue the sufficiency of his DUI conviction in his brief. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Yah*, 317 Neb. 730, 11 N.W.3d 632 (2024). Nevertheless, we briefly address the issue because in his argument regarding the sufficiency of the evidence for his conviction for possessing the firearm, he did question whether there was evidence that he was driving the vehicle. As stated previously, Falcon admitted to Officer Dirks that he had been driving that vehicle. Additionally, Martinez testified that Falcon was driving the vehicle. Falcon submitted to a DataMaster test after his arrest; the State and the defense stipulated that "with the margin of error of the DataMaster, the reading would be

[.14915 grams of alcohol per 210 liters of breath].” Viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Falcon's conviction for DUI.

## VI. CONCLUSION

For the reasons stated above, we affirm Falcon's convictions for possession of a firearm by a prohibited person and DUI.

Affirmed.